NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

COATS & CLARK, INC. (Acworth Plant), Respondent.

No. 15730.

United States Court of Appeals Fifth Circuit.

April 6, 1956.

568

· Arnold Ordman, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Elizabeth W. Weston, Morris A. Solomon, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

· Marion A. Prowell, Frank A. Constangy, Atlanta, Ga., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The Board seeks enforcement of its order issued against Respondent, a Georgia thread and textile manufacturer, on April 14, 1955, and based upon findings that Respondent had engaged, through its supervisory officials, in coercive interrogation of its employees as to their union activity, in violation of § 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1), and had further violated § 8(a) (3) of the Act in discharging an employee, Walker Glover, because of his active support of the un-

ion[1] during its 1953 organizational campaign at Respondent's Acworth, Georgia plant. The Board's decision and order are reported at 112 N.L.R.B. 27.[2]

The credited testimony supporting the Board's findings as to Respondent's employee interference and restraint, in violation of § 8(a) (1), reveals that almost from the inception of the union's organizational campaign in August, 1953, the employee, Walker Glover, and his wife, "Pat", became known by several of Respondent's supervisory officials as active union protagonists, and were warned that unionization would cause "nothing but trouble and confusion", as well as loss of employment.[3]

■ On October 19, 1953, after Walker Glover and his wife had attended a union meeting held over the weekend, a supervisory official, Gilbert, questioned Walker Glover as to what he had learned at the meeting, inquired whether he had been promised a job, and that same day also asked Glover's wife how many of Respondent's employees had attended the meeting. Overseer Brown later questioned "Pat" Glover as to "who all in the plant was for the union," stating that she should know "because the union man had been coming to (her) house so often." On another occasion during the next month, Overseer Brown showed "Pat" Glover "some machinery which had been shipped into the plant * * * from Pawtucket and (stated) that they had closed down there, that Clark wouldn't run under contract, and they were closing as fast as they could," after

which he warned that she would be "laid off from the company" for "trying to bring in outsiders", if she was so engaged. Further credited testimony reveals that during this same period Overseer Brown warned another employee, Clifford Morris, that the union organizer "is not going to * * * doff these winders for you, (that) I have been good to you and paid you more than any of the rest of them are getting and if I find out you are lined up with Pat and Walker, to Hell with you." During early February of the following year, Overseer Brown warned a new employee, Betty Baker, that she had not been hired because of her ability to operate a certain machine, since Respondent had other girls "who can beat you all to pieces", and that she should not "listen to any * * * rumors" if she did not wish "to mess up (her) reputation by going against the company." Subsequently, during an inspection tour of the plant for the benefit of recently hired employees, Overseer Brown stated that "Mr. Clark had sworn and be damned that he wouldn't have an organized mill in the South," and that Walker and "Pat" Glover were "getting paid plenty for what they were doing for the CIO." Finally, on February 22, 1954, the Monday before Walker Glover's discharge on Friday, Brown asked him which of Respondent's employees had attended another weekend union meeting, and when Glover refused to reveal their names, Brown replied that he had that information anyway. On March 2, 1954, after

---

1. Textile Workers of America, CIO.

2. A majority of the Board affirmed the findings of the Trial Examiner without substantial modification. The dissenting member, Phillip Ray Rogers, differed from the conclusions of the Trial Examiner and the Board majority as to Walker Glover's discharge having been discriminatorily motivated, in violation of § 8(a) (3) of the Act.

3. Marie or "Pat" Glover further testified relative to these August, 1953, conversations that Gilbert told her "he heard there was a union man coming to my house * * * and * * * he hoped

they wouldn't organize because the mill would close down and he said Clark wouldn't have a contract"; that "the mill at Pawtucket * * * hadn't run full time since they organized there"; and that unionization "was a branch of Communism." However, since these conversations allegedly occurred prior to the six months limitation proviso of § 10(b) of the Act, 29 U.S.C.A. § 160(b), they were considered by the Board only as "background evidence" of Respondent's union antipathy, and not as probative proof in support of the 8(a) (1) violations found.

all of the above incidents had transpired, the union was defeated in a Board conducted election held at Respondent's Clarksdale plant.

Admittedly, the above summarized findings of both the Trial Examiner and the Board are based in major part upon the credited testimony of Walker and "Pat" Glover, as well as upon the testimony of several other pro-union employees, and the Trial Examiner, in resolving conflicts in the testimony, necessarily made certain credibility resolutions requiring rejection of contrary testimony by Respondent's supervisory officials. However, even the dissenting Board member did not attack the majority's implied affirmance of the Trial Examiner's factual findings as to Respondent's 8(a) (1) violations, and Respondent in brief does not seriously challenge that portion of the Board's order based upon these findings, though it incidentally urges that the complained of interrogation was too isolated, innocuous, and noncoercive in character to justify a finding of any independent 8(a) (1) violations of the Act. We think, however, that the findings of interference, restraint and coercion, within the prohibition of § 8(a) (1) of the Act, are supported by substantial evidence on the record considered as a whole, and that the cease and desist provisions of the Board's order based upon these findings should therefore be enforced. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Nashua Mfg. Corp. of Texas, 5 Cir., 218 F.2d 886; N. L. R. B. v. C. & J. Camp, Inc., 5 Cir., 216 F.2d 113.

Upon this record, however, a much closer question is presented on the issue of whether Walker Glover is entitled to reinstatement and lost back pay, under the finding that he was discriminatorily discharged for his union activities, in violation of § 8(a) (3) of the Act. Since the findings and ultimate conclusion of the Board majority as to Respondent's discriminatory motivation for Glover's discharge, as contrasted with the contrary view of the dissenting Board member that his discharge was for justifiable cause, fairly present in sharp focus the composite factual picture, their opposing versions are quoted in part in the margin.[4] To these accurate and compact summarizations of the most co-

---

4. A majority of the Board reasoned thus:
"* * * the fact that Glover left his job twice on the day of his discharge (does not) require a conclusion that his discharge was disciplinary and not motivated by antiunion considerations. These events must be viewed in the light of the surrounding circumstances and the effect of the absences upon the Respondent's business in deciding whether they provide the real reason for the discharge or only a pretext. At the time of his discharge, Glover had been in the Respondent's employ for 6½ years, and, as noted above, during the first 6 years of his employment the Respondent admits that he had had a good work record. There is no showing that the Respondent's operations were hindered in any way by his absences on the day of his discharge. On the contrary, by doffing the spindles for his disabled (pregnant) wife, and thus making it possible for her to resume operations, and by getting supplies for the job to which he had been assigned, Glover was plainly acting in the Respondent's interest. Moreover, it is to be noted, that he did the doffing only after Mrs. Glover had waited an hour in vain for Overseer Brown who had agreed to perform the function. We do not believe that a non-discriminatorily motivated employer would have discharged Glover under such circumstances. It is much more reasonable to infer that Glover's union activities, toward which Respondent had been hostile, were the real reason for his discharge.

"On the basis of the above facts and the record as a whole, we find that the preponderance of the evidence establishes that the reasons given for Glover's discharge were not the real reasons, but that they were a pretext to hide the antiunion motivation of the Respondent. Accordingly, we find that the Respondent violated Section 8(a) (3) of the Act by discharging Walker Glover."

The dissenting Board member, however, reasoned as follows:
"I do not believe that the record shows that the Respondent discriminatorily discharged Walker Glover.

gent testimony supporting each view, we need add only a few additional comments.

Irrespective of any permissible inference of respondent's anti-union animus from its proven 8(a) (1) violations, from the showing of Walker Glover's extended period of apparently satisfactory service with Respondent prior to his union affiliation, and from the proof that he and his wife abruptly fell from grace with Respondent's supervisors when their active union advocacy became known, upon this record the unalterable facts remain that, on the very afternoon of his discharge, Plant Manager Hilley told Glover to "stay on the job * * * and get this twister started up," and that he had heard about Glover "leaving the job and being gone too long";[5] that Hilley further gave specific orders to Overseer Brown to watch Glover the rest of the day and discharge him should he disobey Hilley's orders; that in spite of this warning Glover left his assigned duties in the twister room without permission and within a half hour to get supplies, and was observed by Brown en route to the supply room; that about an hour later, Glover received a message in the twister room that his pregnant wife wanted help in "doffing" her winder spindles,[6] and he again left his assigned duties without permission and went to the warehouse, where he not only "doffed" spindles for his pregnant wife, but also accommodated her partner on the winder frame, Dorothy Benson, by "doffing" her spindles as well, in which latter activity he was admittedly engaged when observed for the second time by Brown since his earlier warning that same afternoon against leaving his assigned duties, and discharged. However understandable and commendable Glover's effort to help his pregnant wife may appear, and however leniently we might otherwise be disposed to view his temporary deviation in her behalf alone, the fact remains that at the time of his discharge Glover was not "doffing" his wife's frames, but was unnecessarily prolonging at her instance his second absence from his assigned duties without permission, in spite of Hilley's prior warning, by doing another employee's

---

"* * * Notwithstanding the plant manager's order to stay on the job, Glover left his work twice, once to go to the supply room, stopping to talk to a watchman, and a second time to doff the spindles of his wife and those of another worker. Doffing spindles was not part of Glover's regular job, although he performed that work on occasion. * * * I do not agree that the General Counsel has established the pretext theory by a preponderance of the evidence. Before being assigned to the twister job on February 26, Glover was warned about his frequent absences and was instructed to stay on the job. He ignored the warning and instructions and absented himself from the job without the approval of his supervisor. Overseer Brown then discharged him in accordance with his own previously received instructions. There is no evidence here of entrapment, as the Trial Examiner insinuates but, significantly, does not find to have been the case. The order to Glover to stay on the job was clearly reasonable in the circumstances. No action whatever was taken against Mrs. Glover. Nor is there any showing that any action was taken against any other employee because of

union activity. Although the evidence shows some hostility on the part of the Respondent toward the Union and toward Glover because of his union activities, that evidence, without more, is not sufficient, I believe, to convert what clearly is a disciplinary discharge into an unfair labor practice. The fact that an employee is active on behalf of a union does not give him a privileged status. Nor does an employer's hostility to a union deprive him of the right to take warranted disciplinary action against an employee for reasons unconnected with the latter's union activities.

"Accordingly, I would find, contrary to the Trial Examiner and my colleagues, that the Respondent discharged Walker Glover for cause, and not for discriminatory reasons."

5. Of course, Glover denied this warning, but the Trial Examiner and Board credited Hilley's version as to his instructions to Glover prior to his discharge.

6. This "doffing" operation consists of removing the full bobbins of thread from the spindles and placing them on top of the machine.

work, to whom he owed no obligation and who had neither sent for him nor solicited his aid as in distress. A hard-working, plant-roving, "Good Samaritan" may be popular with less diligent and productive employees, but we think it not unreasonable for management, except in unusual or emergency instances, to restrict and channel his activity toward his own assigned work in the interest of production and plant discipline, and that management is well within its rights in requiring each employee to make a reasonable effort to discharge on a priority basis that work for which he or she is paid.

Adopting the above view, which is based not so much upon our acceptance of any proof rejected below, but upon substantially uncontradicted testimony credited by the Trial Examiner and Board, we doubt whether the Board majority could as reasonably have inferred that Glover's discharge for violation of his express instructions was but a factually pretextuous cloak to conceal respondent's discriminatory motivation, as it could have that his termination was predominantly motivated by the desire of Hilley and Brown to maintain production and preserve discipline. Cf. N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 211 F.2d 848, 854; N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883, 885; N. L. R. B. v. J. H. Rutter-Rex Mfg. Co., 5 Cir., 229 F.2d 816. However, since Respondent strongly relies upon, and the Board in its reply brief apparently questions, the soundness of this Circuit's Houston Chronicle rule, supra, as recently reiterated in N. L. R. B. v. Huber & Huber Motor Express, Inc., 5 Cir., 223 F.2d 748, 749, and the Rutter-Rex case, supra, and particularly as contrasted with other expressions of this Circuit in N. L. R. B. v. Robbins Tire & Rubber Co., 161 F.2d 798, 801; N. L. R. B. v. Nabors, 196 F.2d 272, 275; and N. L. R. B. v. Truck Drivers & Helpers, etc., 228 F.2d 791; probably some amplification and modification of that rule is here appropriate.

We agree that the initial choice between two equally conflicting inferences of discriminatory or non-discriminatory employer motivation for an employee discharge is primarily the province of the Board, for under the Universal Camera Corp. case, supra, and its substantiality test of review, previously accorded statutory recognition in § 10 (e) of the Act, this Court "may [not] displace the Board's choice between two fairly conflicting views" and inferences, "even though the court would justifiably have made a different choice had the matter been before it de novo." 340 U.S. 474, 487–488, 71 S.Ct. 456, 465. But granting that we may not disturb the Board's choice between equally conflicting inferences where we find both a lawful and unlawful inference of employer motivation "equally reasonable", we think the rationale of all the cases cited does permit our displacement of the Board's initial choice where, as here, we find no substantial evidence on the record considered as a whole, Universal Camera Corp. v. N. L. R. B., supra, to support the inference drawn by it as "reasonable", and to the contrary, deem it contrary to uncontradicted testimony clearly showing a lawfully motivated discharge "for cause" under § 10(c) of the Act. N. L. R. B. v. Blue Bell, Inc., 5 Cir., 219 F.2d 796, 798; N. L. R. B. v. General Drivers, etc., 5 Cir., 225 F.2d 205, 211.

Finally, we do not think that objective analysis of Respondent's subjective motivation in discharging Walker Glover is aided in this instance by any gratuitous administrative or judicial theorizing as to whether Glover's activities at the time of his discharge were excusable as "plainly in respondent's interest", for which discharge was "too severe a penalty", for we think the Houston Chronicle case, supra, established the proposition that, assuming a close issue on employer motivation, the Board may not legitimately so penalize and inhibit an employer's exercise of his managerial prerogative and discre-

tion under the Act. See also, National Labor Relations Board v. Local Union No. 1229 International Brotherhood of Electrical Workers, 346 U.S. 464, 474, 74 S.Ct. 172, 98 L.Ed. 195; N. L. R. B. v. American Thread Co., 5 Cir., 210 F.2d 381; N. L. R. B. v. Armour & Co., 5 Cir., 213 F.2d 625; N. L. R. B. v. Late Chevrolet Co., 8 Cir., 211 F.2d 653, 655.

It follows that the cease and desist provisions of the Board's order, based upon the 8(a) (1) violations found, is entitled to enforcement, but that enforcement for that portion of the order based upon the finding of Walker Glover's discriminatory discharge will be denied.

Order enforced in part and denied in part.