**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WEST POINT MANUFACTURING COM-PANY (Lanett Mill), Respondent.**

**No. 16301.**

United States Court of Appeals
Fifth Circuit.

June 10, 1957.

Irwin M. Herman, Atty., N.L.R.B., Washington, D. C., Stephen Leonard, Asst. Atty. Gen. N.L.R.B., Kenneth C. McGuiness, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Frederick U. Reel, Atty., N.L.R.B., Washington, D. C., for petitioner.

Frank A. Constangy, M. A. Prowell, Mildred McClelland, Atlanta, Ga., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

This is a petition for the enforcement of an order of the National Labor Relations Board[1] which would require respondent to cease and desist from certain unfair labor practices in violation of section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and to reinstate with back pay a number of employees allegedly discharged in violation of section 8(a) (3) of the Act. The only issue is whether the findings of the Board regarding these

1. 115 N.L.R.B. 448.

unfair labor practices are "supported by substantial evidence on the record considered as a whole."[2] Respondent operates several textile mills in and around Langsdale, Alabama, including the Lanett Mill employing about 2500 workers to which this proceeding relates. It appears that from the beginning of 1955, and extending throughout the entire period here under consideration, the company was engaged in a major effort to increase the efficiency and quality of its production and to recover, through increased pressure put on its employees and supervisors, from a considerable slump in its operations. In apparently its first effort to organize the plant, the Textile Workers Union of America, CIO, in February 1955 sent a descriptive pamphlet to many residents of Langsdale, including employees and supervisors of the mill. On receiving requests for further information and help an organizer was sent later in the month and a number of small meetings with employees took place. This activity was evidently known to officials and supervisors of the respondent for as early as March 1st an employee was questioned about the activities of the union. On March 5th a mass meeting was held at which a 46 man "organizing committee" was selected and thereafter large scale solicitation of members was started.

On March 10th the respondent posted on its bulletin board an order forbidding all solicitations, excepting only those for charity or individual hardship if written permission of the supervisor was first obtained.[3] In his pay envelope each employee also received a letter from the Executive Vice President of the respondent which stated the position of the company to be:

"We believe that the unionization of our plants would be against your interest, our interest, and the interest of our community."

and after reciting at length the difficulties of the New England textile industry allegedly due to unionization, and suggesting that if the union came to the plant the result would be strikes, shutdowns, eventual removal of the mill, and unemployment and ruin for its workers, it concluded:

"If you don't want to run the risk of laying yourselves open to the same sort of results that hundreds of employed cotton mill employees in New England have been subjected to as a result of this union's activity, you, as well as I, will express the sentiments set forth in this letter—that there is no place for the CIO in Lanett or elsewhere in the Valley."

On the same day Mrs. Danford, a member of the organizing committee and known to the respondent's supervisors to be a union member, was fired, allegedly for repeatedly violating an order regarding the method of performing her work.

On March 11th a letter was sent to the President of the respondent (with a copy to the N. L. R. B.), signed by all the members of the organizing committee, which merely recited the formation of the committee and expressed a desire that the union be able to establish fruitful and harmonious relations with the company. On the same day another member of the committee was discharged for reading a newspaper on his job. The solicitation campaign thereafter continued for some time, though in general apparently not in violation of the company rule—but during the same period an increasing number of employees withdrew their authorization cards from the union; at the high-water marks perhaps 700 employees had assented to union representation. After some more discharges had

---

**2.** 29 U.S.C.A. § 160(e); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

**3.** The operative part of the order read as follows:

"Any Employee Who Engages In Solicitation Of Funds, Memberships Or Any Other Kind of Solicitation Within This Plant Without Prior Written Permission From His Overseer, While He Is At Work, Or Any Employee Who Solicits Any Other Employee Who Is At Work, Is Subject To Immediate Disciplinary Action And/Or Discharge."

occurred, including that of several more members of the committee, the leader of the group visited the President of the respondent to seek reinstatement for them; the only satisfaction he received was to be told that though none would be reinstated all could reapply with a clean slate. Thereupon, on March 24th, he wrote a letter to the company to the effect that these discharges reinforced the determination of the employees to organize a union which would protect them from similar dismissals. The following day unfair labor practice charges were filed with the Board, reciting nine of the discharges. However, during the remainder of the month several more took place. On March 31st a newspaper article was posted on several company bulletin boards, entitled "The Uniontown Story" by the Reverend Bob Nelson, which graphically described the alleged miseries resulting from an attempt to organize a mill in a neighboring small town. On April 5th the charges filed with the Board were amended to include a total of twelve alleged discriminatory discharges.

The trial examiner, after hearing 74 witnesses and examining 40 exhibits, filed a lengthy report finding the respondent guilty of numerous violations of section 8(a) (1) of the Act through unlawful interrogations, threats, promises, and other pressures directed against the employees, and of eight discriminatory discharges in violation of section 8(a) (3); as to three other discharges he dismissed the charges because no evidence was introduced to support them and as to one he found in favor of the respondent as the General Counsel had failed to carry the burden of proof. The Board affirmed all the principal findings of the examiner and accepted his recommended order, requiring, *inter alia*, the reinstatement with back pay of the eight employees and the posting of appropriate notice in the plant.

The trial examiner found evidence of numerous acts of interference, restraint, and coercion on the part of the respondent in derogation of its employees' right to organize or join a union. Employees had been questioned as to their union membership and activities, whether, when, why, and at whose inducement they had joined, and what the union was doing. There were direct and implied threats of discrimination and of firing, and particularly of a shut-down and the consequent hardships if unionization should be accomplished, and when employees who feared discrimination approached their supervisors to ask whether it would indeed be safe for them to resign their membership they were not reassured but instead were merely advised on how to expedite their withdrawal. Finally, several supervisors actively solicited employees to resign from the union by urging them to repossess and destroy their authorization card, to remove their union buttons, and by referring employees who were thus induced to cut their ties with the union to other employees or to a local lawyer who prepared letters of resignation for their signature. Altogether 34 acts of interference are catalogued over a period of six weeks, involving 13 supervisors and 21 employees.

Respondent makes several broad and a few specific attacks on these findings. Many of these go merely to the weight of the evidence, pointing out that some of the cited instances were denied or explained away by the supervisors involved, and that others were established by the testimony of employees found otherwise untrustworthy; these are essentially matters of credibility which form no proper basis for attacking the Board's findings. N. L. R. B. v. Newton, 5 Cir., 236 F.2d 438, 443–444. Many other instances are cited which are said to be inconsistent with the theory of a systematic anti-union policy on the part of respondent: consideration was allegedly shown to the leader of the local when he requested a leave of absence to look for another job (though temporarily re-employed he was advised to, and soon did leave town); an employee was reinstated while actually wearing a union button and many known unionists are

still employed; some employees who asked their supervisors for help in getting out of the union were merely told that they were on their own. Finally it is asserted that the supervisors had been instructed not to discourage unionization by threats—though apparently the prohibition did not include promises and coercive interrogations, nor were the employees informed that any threats by supervisors were made contrary to company policy.

■ In view of the respondent's admitted anti-union attitude and the very widespread pattern of miscellaneous acts by many supervisors which perhaps individually might be explained away but which collectively amount at the very least to an uncoordinated pattern of coercion, we must affirm the Board's findings of the 8(a) (1) violations as supported by substantial evidence on the record taken as a whole and order enforcement of the appropriate parts of the remedial order. N. L. R. B. v. Fox Manufacturing Co., 5 Cir., 238 F.2d 211, 214.

■ As usual the findings regarding the discriminatory discharges are harder to evaluate. As the trial examiner points out, this is not a case of a mass discharge or layoff in which it is easy to draw some general conclusions based perhaps largely on the statistical evidence; each of the eight dismissals found discriminatory by the Board was a separate incident whose circumstances must be individually examined. This task is rendered the more difficult by the fact that the discharges took place against the dual background of respondent's expressed anti-union bias and the established 8(a) (1) violations and an almost simultaneous extraordinary drive to improve the quality and the quantity of the production—both of which would provide reasons for dismissing employees who otherwise might be retained. In each case it must be established whether the legal or the illegal reason for discharge was the actually motivating one, and if evidence of both is present we must ascertain whether the evidence is at least as reasonably susceptible of

the inference of illegal discharge drawn by the Board as it is of the inference of legal discharge. N. L. R. B. v. Fox Manufacturing Co., supra. In doing so we must keep in mind that while proof that a discriminatory purpose was the motivating one is rarely direct, and it may therefore be established from all the circumstances, the burden is throughout upon the Board to establish that it was, and this may not lightly be inferred. N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406.

The general pattern of most of the discharges is somewhat similar: In each case there is some credible evidence that the supervisor concerned knew of the employee's union activities, though not necessarily of its extent. From one or more Employee Warning Records it can be established that certain derelictions had been called to the employee's attention over a period of time—in some cases these go back over a number of years, but generally the series commenced more recently and the slips are bunched with increasing frequency preceding the discharge date, with the initial notice of the terminal set in some cases preceding and in others following the identification of the employee as a union adherent. In all but one instance the immediate alleged cause of the discharge was a specific dereliction, often similar to those for which the employee had previously received warnings. A rather full description of the circumstances of each discharge is necessary to make clear the manner in which we apply the standards heretofore followed by this Court in N. L. R. B. v. Fox Manufacturing Co., supra; N. L. R. B. v. Newton Co., supra; and N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567. Though evidently all twelve of the employees regarding whom charges were filed were among the approximately 700 union adherents, and most of them were actually members of the organizing committee, it does not appear from the record how many of the approximately 2500 employees were released during this period of dual stress, nor does the Board draw any statistical

conclusions, to which we would of course give weight, N. L. R. B. v. Newton Co., 236 F.2d at pages 445–446. Considered individually, though within the context of the established 8(a) (1) violations, the alleged legitimate reasons for most of the discharges appear stronger and the direct evidence of an intention to discriminate weaker than appears in the Fox Manufacturing case, and without some convincing unifying data showing that union adherents were generally treated more severely during this period we cannot permit weak cases to bolster one another.

Mrs. Elizabeth Danford was a Battery Hand of ten years experience whose duty it was to supply the looms with bobbins of fillings (threads) to be woven into the cloth. Her union activity consisted of attending every meeting but the first, membership on the organizing committee, and considerable successful solicitation by which she signed up some 15–16 of the 30–40 employees she had approached; she told her foreman that she was for the union 100%. She was fired on March 10th for carrying unmarked fillings from loom to loom, a procedure which may result in the weaving of improper threads into the cloth, thus reducing its quality to that of "seconds." Though there was much testimony about whether that practice had or had not been tolerated in the past it appears that Mrs. Danford had received two written reprimands for the same dereliction within the past two weeks, on February 24th and on March 1st, both apparently anteceding the union drive and her identification with it; in addition, only 15–20 minutes before she was apprehended for the last time all the Battery Hands had been specifically warned about this practice. Her only excuse was: " * * * if I was carrying filling, I wasn't conscious of it. I have been carrying filling down here for nine years and that is a habit you don't break in five minutes." It appears from a previous warning slip that when the same matter was called to her attention she was very insubordinate and complained that her work was so hard that she did

not have time to think of all these things —yet she had made five or six trips to the smoking booth of an average duration of fifteen minutes each. In view of all these facts it is impossible to say that it is equally likely that she was fired for her union activities as for her negligent workmanship.

Benjamin F. Stone had been employed as a weaver and later as a Loom Fixer for about four years. He joined the union on March 5th and on the same day was interrogated by his supervisor and he admitted this when questioned by his supervisor about what he was doing; he was told he would be discharged if did not stop "that kind of thing." He had been reprimanded on January 24, 1955, before the start of the campaign, for threatening to sabotage the looms of one weaver, and was told he would be fired if he failed to keep the looms running. On March 6th he was given an oral reprimand for reading a newspaper and a written reprimand was given for the same cause on March 7th. On March 11th he was fired for reading a newspaper on the job while machines that needed to be adjusted were awaiting his attention. There was much disputed testimony about whether he was reading at all or merely folding the paper, how long he was reading, and whether he had completed his initial round of inspection, and whether there were any flags up at the time. The trial examiner resolved most of these issues against the respondent, and these adverse findings as to any actual breaches of the rules require that we accord preponderant weight to the determination by the Board that Stone was fired for union activities.

Elvin Smith had been employed for about fourteen years and was working in the Slashing Department. He joined the union on March 5th, attended all the meetings, and as a member of the organizing committee signed the initial letter to the company. Early in the year special smoking booths had been installed in the slashing room and all employees of that department had been warned that they were to take no more

than two smoke breaks during a shift, such a rule being especially important in this particular department; a notation that such a warning had been issued was placed into Smith's personal file on February 10th. On March 10th a written reprimand was issued to Smith for smoking too often, and on the 14th, when he was caught smoking for the third time during the day he was fired. The trial examiner found that in the plant generally smoking was not considered a too serious offense, but few if any of the findings related to this particular department at a time proximate to this discharge or to what was done in case a man was actually caught violating the rule by a supervisor. As in the Danford and some of the subsequent cases we are persuaded by the repetition of the notices about the same offense, here smoking, one of which antecedes the union movement, to find that this was no trumped-up excuse for a discharge.

John Cole had been employed as a Warp Man for one and a half years. He joined the union on March 9th, signed the letter to the company as a member of the committee, signed up a few other employees, admitted his staunch union adherence to a supervisor who questioned him, and wore a union button to work. On February 18th and again on March 11th he was reprimanded for mistakes in his work each of which admittedly was serious enough to be considered cause for discharge. On March 15th he was fired: "as per warning before for defective work—tying on warp with short apron causing oily seconds" a dereliction which would cause the cloth produced to be defective. Though the trial examiner cited considerable evidence to the effect that machines were often operated with short aprons, a reading of the testimony convinces us that respondent is correct in asserting that there is a difference between permitting an apron to get gradually shorter through wear and tying one on that is too short from the start. It also appears that as part of the quality drive a meeting had been held during March at which the use of adequate length aprons was particularly emphasized to the Warp Men. In view of Cole's two previous serious derelictions, and his admission that all these might have been due to the fact that he was sleepy during work time because he was simultaneously going to college, we feel it is more likely that he was fired for poor work rather than for his union sentiments.

James T. Sims had been employed for about four years in respondent's Cloth Room. He joined the union on March 5th, attended all the meetings, signed up about 20 employees, though none after the no solicitation rule was posted, and wore a union button to work. His only previous reprimand had been for too much talking in June 1953. However, he received reprimands for leaving his job and talking to other employees, who stopped their work to listen to him, on March 11th, 14th, 17th, 19th, when he was finally fired. Though petitioner in its brief speculates that the only reason why this casual talking appeared to interfere so greatly with the work of the other employees was that they were nervous about talking about the union, the trial examiner found specifically that in general that was not the subject of Sims' conversations. Though the trial examiner found that there was no general no talking rule at the mill, there was no finding that workers were generally permitted to wander over to other machines in order to strike up conversations. In view of this series of reprimands for the same cause, none of which are attacked on factual grounds, we cannot say that the discharge was clearly not for cause.

James C. Reed, Jr., had been employed by the respondent for nine years and was working as a Warp Man. He joined the union on March 7th, was elected to the organizing committee, attending meetings, wore a union button to work, and solicited for members. The first warning notice of his career was filed on March 15th and it records that another employee had complained to the Night Supervisor that Reed had bothered him at his job several times about joining the

union; this "warning," however, was not communicated to Reed. On March 16th and 22nd he was written up for improper work, but it does not appear how serious the dereliction was. On March 25th Reed was eating lunch with two employees; they were heard talking about the CIO. As they were finishing their meal one of the men started back to work while the other asked Reed for a union card. Reed gave him one, together with a pencil, and asked the first man to wait so they could all go back together. As soon as the card was signed it was returned to Reed and all three returned to work. The incident had been observed and Reed was immediately "Discharged for Solicitation in Mill CIO Union Membership in Violation of Company Policy." As the trial examiner pointed out neither Reed nor the employee who asked him for a card was "at work" as specified in the no solicitation order; at most it might be said that the third man was detained from returning to work, but it is not claimed that that was for the purpose of soliciting him. Respondent, however, argues that all employees ate on company time, that no fixed time was set aside for meals, and that though employees were permitted to leave their work in order to eat they were required to return to their jobs without delay once they had finished. Without determining whether the no solicitation order if thus broadly interpreted would be valid, especially in view of the anti-union material disseminated in the plant by the respondent, it appears to us that the trial examiner interpretation of the "at work" requirement is the more reasonable one. Though an employee may be paid while eating he is hardly "at work" in the usual sense, and though he may be required to return to his work immediately upon finishing, Reed was not fired for loitering or for unduly prolonging his meals. As respondent repeatedly points out in his brief, much of the work at the mill is with high speed machinery and requires close attention; it is therefore undesirable if employees wander away from their jobs or if they are distracted while performing them, but the same is not necessarily true where both employees are away for a protracted time from the work area. Since we agree that Reed was not fired for a violation of the no solicitation rule as reasonably interpreted, we agree with the Board that it is more than likely that he was discriminatorily dismissed for his union activities. Cf. N. L. R. B. v. Avondale Mills, 5 Cir., 242 F.2d 669, 671.

Herman Crowder had been employed as a weaver for over twelve years. He joined the union on March 5th, became a member of the organizing committee, attended all meetings, wore a union button, and signed up many members. His record as a weaver had been poor for some years, and he had been laid off twice in 1954 for his poor work; on March 11, 1955, he was warned he would be discharged unless the quality of his work improved. On March 26th his supervisor found 9 out of his 36 machines producing seconds, a ratio that he testifies was unprecedented. Though the fault in about half the cases was that of the machine, it is plain that under such circumstances it was Crowder's duty to stop his machines and have someone adjust them; but when the defects were called to his attention he at first denied that the cloth being woven was in any way defective. Much evidence was introduced to the effect that Crowder was by no means the worst weaver in the department, but in view of his previous poor record and the very recent warning on the quality of his work, it appears to us that there was cause to discharge him when found at one point to be producing 25% seconds (during the past four weeks his average for seconds had been 5.6% while that for all weavers had been 3.6%).

Mrs. Genelle G. Tankersley had been employed for about nine years as a weaver. She joined the union on March 5th and attended its meetings; though not a member of the organizing committee her nephew (also named Tankersley) was cosigner of the letter to the company, as was another person by that name, who may have been her husband, also a union member. She had been twice interrogat-

ed about her union activities. Her work record was rather poor and she had been reprimanded for excessive seconds on January 10th, March 14th, 25th, 28th, and 29th, when she was finally discharged. Both sides introduced a mass of statistics to prove that her performance was or was not considerably worse than that of other weavers working on equivalent jobs and that her work was or was not improving. The trial examiner stated that the matter could not be resolved on the basis of these statistics, and that if Mrs. Tankersley's discharge were viewed in isolation there would be little evidence to establish the contention of a discriminatory discharge; however by viewing the pattern of the entire case he found sufficient ground for holding against the respondent. In view of our disagreement on most of the other findings of the sufficiency of the proof of the discriminatory discharges we are unable to agree with the Board in this instance either.

The petition for enforcement is granted as to the section 8(a) (1) violations and as to the reinstatement with back pay of Benjamin F. Stone and James C. Reed, and is denied as to all the other named employees.