**SCHWOB MANUFACTURING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18819.

United States Court of Appeals Fifth Circuit.

Jan. 2, 1962.

J. Madden Hatcher, Lee H. Henkel, Jr., Swift, Pease, Davidson & Chapman, Columbus, Ga., for petitioner. Tom B. Slade, Hatcher, Smith, Stubbs & Rothschild, Columbus, Ga., of counsel.

Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Atty., Stuart Rothman, Gen. Counsel, Judith Bleich Kahn, Attys., N. L. R. B., Washington, D. C., for respondent.

Before BROWN, GEWIN and BELL, Circuit Judges.

GEWIN, Circuit Judge.

This case arises out of a petition by Schwob Manufacturing Company to review and set aside an order of the National Labor Relations Board issued against petitioner on November 30, 1960, and the answer of the Board requesting enforcement of its order.[1]

The petitioner is and has been a Georgia corporation with its principal place

---

1. 129 N.L.R.B. No. 101.

of business in Columbus, Georgia. It is engaged in the manufacture of men's clothing. The building in which the petitioner is located includes a pants department located on the first floor and a coat department located primarily on the second floor with some operations on the first floor. There are approximately 100 production employees in the pants department and 174 in the coat department. Organizational activity among petitioner's factory employees began in March and continued through November 1959.

The trial examiner found Schwob Manufacturing guilty of unfair labor practices in violation of Section 8(a) (1) and (a) (3) of the National Labor Relations Act as amended, 29 U.S.C.A. § 158(a) (1) (3). As pointed out by the trial examiner, support for the allegations of independent violations of Sec. 8(a) (1) depends wholly on evidence relative to the activities of section girls and payroll clerk Margie Thompson.[2]

He found that section girls are supervisors, "Since one of the factors in the definition of supervisors under the act is present * * *." He also found that Mrs. Margie Thompson is a supervisor.[3]

As a conclusion of law he states that Schwob violated Sec. 8(a) (1) because of the activities of the section girls and the activities of Mrs. Margie Thompson.

The trial examiner further found that employee Jean Armstead was discharged because of her membership and activity in the union, and not because of defective work done by Armstead as claimed by Schwob, asserting that the defective work was very minor and rare and was used by the employer as a pretext. He therefore concludes as a matter of law that there was discrimination in regard to the hire and tenure of employment of Armstead, in violation of Sec. 8(a) (3). The alleged discriminatory discharges related to only two employees, Betty Lou Anderson and Jean Armstead. It was determined that Anderson quit her employment and was not discharged.

The petitioner claims that Armstead had a record of bad work, had been warned several times, and that other employees had been discharged for the same reason. The petitioner produced records which it claimed to have kept of such prior warnings or reprimands directed to Armstead.

The findings of fact and the conclusions of law set forth by the trial examiner are anchored in large measure to the activity of the section girls; although he also supports them by the activities of Mrs. Margie Thompson and of Foreman Henry Bernhard.[4]

2. The initial question to be decided by the trial examiner as he conceived it was the following:
   "Since support for the allegations of independent violations of Section 8(a) (1) of the Act depends wholly on evidence relating to the activities of section girls and payroll clerk Margie Thompson who Respondent denies are supervisors that issue is crucial and will be disposed of first."

3. The basis of this finding is stated as follows:
   "I find on the basis of all the evidence that Mrs. Margie Thompson is not only a supervisor within the meaning of the Act in respect to her functions as head clerk in the payroll office but that she has assumed, with Respondent's knowledge, or has been permitted to assume, over the years certain supervisory functions. Whether this has been because

of her many years of experience or because it is convenient for Respondent and its supervisors to allow it because of her proximity to the employees I am unable to say. It is sufficient that she has been permitted by Respondent to act like a supervisor to fix Respondent's responsibility for her actions."

4. The following excerpts are from the trial examiner's intermediate report:
   "I find and conclude that Respondent through its section girls, by the acts set forth in the subsection interfered with restrained and coerced its employees in the exercise of their rights under the Act."
   "On the basis of the whole record, including the demeanor of Lammon and Bernhard, I find that an insignificant amount of defective work was produced by Armstead on the day before her discharge which work would have normally

Having determined that there was interference, restraint and coercion in violation of Sec. 8(a) (1); and that the one employee, Armstead, was discharged in violation of Sec. 8(a) (3) because of her membership and activity in the union; the trial examiner concludes that such activities on the part of Schwob "have a close, intimate and substantial relation to trade, traffic and commerce among the several states" and "tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce."

Schwob, the General Counsel and the charging Union all filed exceptions to the intermediate report with supporting briefs. By stipulation, the exceptions of General Counsel and the charging Union were omitted from the printed record.

In its order and decision, the Board found no prejudicial error and affirmed the rulings of the trial examiner, but did modify, amend and make additions to the intermediate report.[5]

After noting the modifications, amendments and additions mentioned, the Board based its order, "upon the entire record in this proceeding."

To the disagreement and dissatisfaction of all concerned with the various findings, conclusions and orders reflected by the record, we must add our own complete dissatisfaction with them. Ap-

parently, all who have dealt with this case have been unhappy with the results at various stages. No one, including the Board, could fully agree with the trial examiner. Neither can we; and further, we cannot fully agree with the Board.

We do agree with the Board that the section girls are not supervisors. We further conclude that Mrs. Thompson was supervisor of the payroll employees, but she was not a supervisor over employees in the shop and she was not held out to be such by the employer. She was a supervisor within the meaning of the Act.

It is our task to determine whether the Board's findings are supported by substantial evidence. As noted in Martel Mills Corp. v. N. L. R. B., 4 Cir., 114 F. 2d 624, and in numerous other cases, the rules by which we are to be guided in making this determination have been clearly stated. The rules are simple but their application is complex. We must carefully analyze and review the evidence in order to determine its sufficiency; and to decide whether it is evidence which "a reasonable mind might accept as adequate to support a conclusion;"[6] and which affords a "substantial basis of fact from which the fact in issue can be reasonably inferred."[7]

Evidence which does no more than create suspicion or gives rise to inconsistent inferences is not sufficient, Ap-

---

been given back to her by her section girl without further incident but that such minor variation from standards was used by Respondent as a pretext for Armstead's discharge which was actually motivated by her membership and activity in the Union. This finding is supported by section girls Lammon and Vaughn's untoward interest in Armstead's union activity in the light of their own opposition to the Union."

5. The following are some of the significant modifications, amendments, or additions made by the Board:—(a) Section girls are not supervisors and Schwob is not otherwise responsible for their conduct; (b) The record does not support a finding of a violation of Sec. 8(a) (1) by Mrs. Margie Thompson's interrogation of

Averritt as to Averritt's own union activities; (c) The Board found it unnecessary to rely on trial examiner's finding that Thompson was held out as a supervisor over employees in the shop; (d) Found it unnecessary to rely in part as did the trial examiner on the interest of the section girls in Armstead's union activity and their opposition to the union. (The Board found that Armstead had disclosed her adherence to the union to supervisor Thompson, before her discharge.)

6. Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126.

7. N. L. R. B. v. Columbian Enamel and Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660.

palachian Electric Power Co. v. N. L. R. B., 4 Cir., 93 F.2d 985. Matters of credibility form no proper basis for attacking the Board's findings, N. L. R. B. v. West Point Mfg. Co., 245 F.2d 783. Whether or not there is a background of antiunion attitude and a wide spread pattern of antiunion conduct; or whether the petitioner has no background of antiunion animus are proper matters for our consideration, Martel Mills Corp. v. N. L. R. B., supra, 114 F.2d 624; N. L. R. B. v. West Mfg. Co., supra, 245 F.2d 783.

In this case, the record fails to disclose any labor difficulties between the petitioner and its employees prior to the occurrences under consideration in this case. On the other hand, the record establishes that all officials of the company had carefully instructed the entire line of supervisory authority in petitioner's plant to take a "hands off attitude" and to remain absolutely neutral. These instructions were carefully followed with the exception of Mrs. Margie Thompson.

■ In cases of this nature the burden of proof is upon the General Counsel. As stated in N. L. R. B. v. Wintergarden Citrus Production Co., 260 F.2d 913:

"It is not and never has been the law that the board may recover upon failure of the respondent to make proof. The burden is on the board throughout to prove its allegations, and this burden never shifts. It is, of course, true that if the board offers sufficient evidence to support a finding against it, a respondent, as stated in the quotation first above, stands in danger of having such a finding made unless he refutes the evidence which supports it. But it is wholly incorrect to say or suggest that the burden of showing compliance with the act ever shifts to the respondent. The burden of showing no compliance is always on the board. Even in cases of actual discharges, cases in short in which the respondent has taken affirmative action against an employee, this is true, as this court has many times held."

### Sec. 8(a) (1) Violation

■ Since the activity of the section girls has been eliminated by the findings of the Board (with which we agree), we have only to consider the activities of Mrs. Margie Thompson. The dealings of Mrs. Thompson related chiefly to two employees only, Averritt and Vinson. In view of the finding of the Board that the record does not support a finding of a violation by Mrs. Thompson's interrogation of Averritt, our chief concern as to this violation relates to the activity of Mrs. Thompson with employee Vinson.[8]

According to Vinson, some fellow employee suggested that she talk with Margie Thompson about the union. At first Vinson decided she would not do so, but later in the day when she and Mrs. Thompson met, Vinson stopped Thompson and asked for permission to discuss the subject. Mrs. Thompson stated that she was not supposed to discuss the matter, but Vinson insisted that she do so. In this conversation, according to Vinson, Mrs. Thompson told her that, "It was up to the girls if they wanted a union * * *." Vinson claims that Mrs. Thompson stated that she had discussed the matter with certain of the officials and the pension plan and free insurance were mentioned. In this conversation, it is also claimed by Vinson that Thompson commented, that during Mr. Schwob's lifetime he said he would close the shop before he would "have the union in". It is also claimed that some mention was made about "our welfare association" and how other employees felt about the

---

8. The Board stated:

"As the corrected record does not support the Trial Examiner's finding of a violation of Section 8(a) (1) by Mrs. Margie Thompson's interrogation of Averitt as to Averitt's own union activities, we do not rely on such finding. We also find it unnecessary to rely on the trial examiner's findings that Thompson was held out as a supervisor over employees in the shop."

union. This witness admitted that she sought out Thompson for the purpose of talking to her "about several things," and reiterated that Mrs. Thompson said she was not supposed "to talk about it at all". Vinson is no longer employed by Schwob.

In some respects Vinson's version of the conversation was supported by Thompson. Both agreed that Vinson made the approach and insisted on talking to Thompson; that Thompson insisted that she "did not have anything to do with what she did" and "didn't have any authority to what she did". Thompson stated that she only mentioned that some figures had been obtained from Mrs. Butler (a company official) and that "they are working on the pension plan". Both Vinson and Thompson substantially agree that at the conclusion of the conversation Thompson stated: "I want to tell you that my talking to you has been strictly on my own. That I had been told not to discuss it with the girls."

There is no evidence whatever in the record that any official took part to the slightest degree in dealings with employees which could be said to violate the section under consideration. The record discloses that Margie Thompson had direct supervision over five payroll employees. She had no authority to hire or fire. She had no supervisory authority over employees in the production departments. As a matter of fact, the record shows that she does not know how to sew.

The petitioner produced a witness, Robbie Myers, who claimed to know Vinson intimately. She lived with her in the same apartment. Robbie Myers testified that she would not believe Betty Vinson under oath. There was no challenge of this evidence.

We hold that this evidence of a single, casual, isolated conversation between Mrs. Thompson and employee Vinson couched in terms of the personal opinions of Thompson, contrary to the instructions of responsible company officials, in circumstances where employee Vinson sought Thompson and insisted upon discussing the question over the objection of Thompson, which conduct on the part of Thompson was not shown to have been approved or ratified by the petitioner, does not reach the required standard set down by the law. It cannot be accepted as adequate to support the conclusions reached and it does not furnish a sufficient foundation of fact upon which the findings of the Board can be properly grounded and supported.

It is interesting to note that some emphasis is laid on the alleged statement by Mrs. Thompson as to what Simon Schwob had said before his death. Mr. Schwob died in 1954, five years before the charges were preferred. As to matters under consideration here, death ends all—or at least we have always thought so.

Of singular interest also is the fact that there were 274 production employees working in the petitioner's plant. With the exception of some officials and supervisory personnel, it is quite apparent that many of these employees were women. Margie Thompson had been with the company a number of years. In the circumstances of this case we cannot attribute interference, restraint and coercion to the petitioner because two women met and engaged in the discussion of a subject which was of interest to them both no doubt. Whether the right of free speech is involved or not, we doubt that this Court or any other agency known to mankind will ever be able to stop conversations of the kind involved here between two women employees; N. L. R. B. v. Cosco Production Co., 5 Cir., 1960, 280 F.2d 905; Quaker State Oil Refining Corp. v. N. L. R. B., 3 Cir., 119 F.2d 631, 633. In the last cited case the Court held as follows with respect to conversations between Healy, a field or pipeline superintendent, and McElhatten, a superintendent of maintenance, and certain employees:

"To a fourth he said he did not see how the Union could benefit the employees and that he believed the petitioner would shut the plant down

before giving recognition to it. McElhatten stated to one employee with reference to the welding of certain tubes that prior to the Union that work would have been done at the petitioner's shop but after the Union they intended to send the work away. He also said that in the future they would let out to contractors what work they could. He made a similar statement to another employee. In the case of Healy none of the employees to whom he talked was under his supervision.

"It is quite clear that all of these conversations took place casually in the course of conversations between the individuals concerned. There is no evidence that they had the slightest effect in actually preventing or discouraging membership in the Union. The Board nevertheless found that the petitioner was responsible for the statements made by Healy and McElhatten and that thereby it interfered with, restrained and coerced its employees in the exercise of the rights of self-organization and collective bargaining guaranteed them by Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157. We do not think that this finding is supported by substantial evidence. Isolated statements by minor supervisory employees made casually in conversation with fellow employees without the knowledge of their employer and not in the course of their duty or in the exercise of their delegated authority over those employees ought not to be too quickly imputed to their employer as its breach of the law."

The 8(a) (3) Discharge

■■ The alleged violation of Sec. 8 (a) (1) outlined above related essentially to one employee. It is likewise true that the violation of Sec. 8(a) (3) related to only one employee out of 274. The employee's name is Jean Armstead. One of the critical questions here is whether any responsible company official or supervisor knew of Jean Armstead's union membership prior to her discharge. The Board held that the petitioner was so informed by virtue of a single conversation she had with Margie Thompson, plus some intimation that Foreman Henry Bernhard also knew. Here again the burden was on General Counsel to prove that management knew that Armstead was a member of the union and that this knowledge motivated the discharge. Subject only to the definite limitation provided by the statute, management may discharge an employee as it sees fit:

"The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a) (3) forbids. N. L. R. B. v. Nabors, [5 Cir., 196 F.2d 272], supra; N. L. R. B. v. National Paper Co., [5 Cir., 216 F.2d 859], supra; N. L. R. B. v. Blue Bell, Inc. [5 Cir., 219 F.2d 796], supra; N. L. R. B. v. C. & J. Camp, Inc., [5 Cir., 216 F.2d 113], supra." N.

L. R. B. v. T. A. McGahey, Sr., et als., 5 Cir., 233 F.2d 406, 412.

Union membership is no guaranty against discharge. An employer cannot however discharge because of a union membership or activity. If a causal connection is shown between the act of discharging on the part of management and union activity and membership on the part of the employee, a violation occurs.

Jean Armstead worked as a machine operator from January 28, 1958, until her discharge on July 28, 1959. The petitioner claims that Jean Armstead was discharged because of unsatisfactory work.

The trial examiner found that an insignificant amount of defective work was produced by Armstead "on the day before her discharge" and that "such minor variation from standards" was used as a pretext for Armstead's discharge. The trial examiner relied heavily on the activity of section girls Lammon and Vaughn.[9]

The Board agreed with the conclusion reached by the trial examiner but refused to adopt his finding with reference to the activity of the section girls. The Board supported the trial examiner because the Board found that Armstead had disclosed her adherence to the union to Supervisor Thompson before the discharge.[10] This was found although the Board further concluded: "We also find it unnecessary to rely on the trial examiner's finding that Thompson was held out as a supervisor over *employees in the shop.*" (emphasis supplied) Armstead worked in the shop.

While we agree with the Board that the trial examiner undertook to support his finding with improper evidence, we cannot agree that the Board has supported its finding with substantially reasonable, believable evidence. Although we have concluded that Mrs. Margie Thompson was a supervisor within the meaning of the act, it is of significance that the Board has found (and we agree) that Thompson was not held out as a supervisor over employees in the shop. Jean Armstead was one of 274 employees.

On the question of petitioner's knowledge of Armstead's union activity, a careful examination of the record is necessary. From it we conclude that Jean Armstead consistently refused to disclose one way or the other her attitude about the union until the time of her discharge and after Foreman Bernhard had decided to discharge her. In the very beginning she stated that Margaret Slaughter, another employee, asked her to "sign union or non-union. And I didn't sign.". The next episode was a conversation between another employee, Elva Bradley, and Armstead, which occurred in the bathroom. Bradley told Armstead that they might let her go because "they thought I was the—she thought I was in the union". On further questioning her answer was "she said that they—she didn't say who they were". Armstead then went to see Margie Thompson and she describes this contact in the following language: "I called Margie Thompson back to my machine and hold her

9. "On the basis of the whole record, including the demeanor of Lammon and Bernhard, I find that an insignificant amount of defective work was produced by Armstead *on the day before her discharge* which work would have normally been given back to her by her section girl without further incident but that such minor variation from standards was used by Respondent as a pretext for Armstead's discharge which was actually motivated by her membership and activity in the Union. This finding is supported by *section girls Lammon and Vaughn's untoward interest in Armstead's un-* ion *activity* in the light of their own opposition to the Union." (emphasis supplied)

10. "We find it unnecessary, however, in making a finding as to Respondent's knowledge of Armstead's union activity, to rely in part, as did the Trial Examiner, on the interest of the section girls in Armstead's union activity and their opposition to the union. It is clear Armstead had disclosed her adherence to the union to Supervisor Thompson, before the discharge."

what Elva had told me in the bathroom and she told me to go see Grace Anthony and Margie told me to go on and see Grace." Armstead then went to see Grace Anthony, still another employee, and took Elva Bradley with her. Later Helen Bowden, another employee, informed Armstead that Grace Anthony wished to see her again. In that conversation Helen Bowden tried to find out whether Jean Armstead was a member of the union. She did not find out. Jean Armstead again went back to see Grace Anthony and discussed the matter, but Armstead made no disclosure with respect to the union at that time. On June 26, Armstead had a general conversation with Margie Thompson in which a story relating to unions in Redbook Magazine was mentioned. There was also a statement that Armstead told Thompson that she could be reached at the home of her landlady. As Armstead testified: "She wanted to know if I would call her if I heard anything during vacation." This conversation was responsive to a question by General Counsel as to whether Jean Armstead had discussed the union with Margie Thompson. Armstead answered the question as follows: "Yes sir, in general".

As to Armstead's communication with Foreman Bernhard, she testified as follows: "Henry said, I do not have anything to do with that—I said Henry, you have never mentioned union to me no ways. He has never mentioned the union." Armstead informed Foreman Bernhard of her union sympathies only after it was apparent that she was to be discharged, although she claims she "knew he knew". How he was informed, she did not say. Before that time, some suspicion may have existed in the minds of some employees about the position of Jean Armstead, but she kept her attitude a complete secret.

As to all conversations and discussions, Jean Armstead testified: "No one has ever been threatened as I know." Even when she was interviewed by counsel for the petitioner after having been interviewed by a representative of the Board, she testified as follows: "Then I told them that there was no need for them to ask me if I was for the union because I wouldn't tell them."

In our opinion, taking in consideration all of the evidence including that most damaging to the petitioner, as illustrated by the quotations set forth above, there is no substantial, believable evidence to support the finding of the Board that there is a Section 8(a) (3) violation.

The rules which guide us in interpreting evidence with reference to discharge are clearly laid down in the case of N. L. R. B. v. Fox Mfg. Co., 5 Cir., 238 F.2d 211, 215:

"Under the rule as announced in Coats & Clark it is still our duty to ascertain whether there is substantial evidence in the record as a whole to make the inferences of legal and illegal discharge reasonably equal. But now if the record warrants the conclusion that they are reasonably equal, we may not overturn the Board's findings of an illegal discharge."

"It is still our duty, however, to ascertain whether there is at least enough substantial evidence from which either inference (i. e., legal or unlawful motive) can be equally found. As said in the McGahey case, 'an unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one.' (233 F.2d 413)."[11]

Testimony is to be interpreted in the light of all facts surrounding the discharge. In this case there is no evi-

---

[11] A reading of the case of N. L. R. B. v. Fox Mfg. Co. will disclose a fact situation as strong and perhaps stronger against the employer with reference to the discharge of the employee White than is presented in the instant case.

dence of antiunion animus, general bias or hostility.[12]

In order to reach the conclusion reached by the Board, violent inferences are necessary. First, without any substantial, believable evidence to support it, there must be an inference that management knew of Armstead's union activity and interest. On that inference must be superimposed the additional inference that the discharge was motivated by an unlawful purpose to discharge Armstead because of her union activity. To reach such conclusions does violence to the true facts.

The order of the Board is set aside and enforcement of it is

Denied.

12. See N. L. R. B. v. Dan River Mills, Inc., 5 Cir., 274 F.2d 381, 384:

"A discharge becomes forbidden only if motivated by an unlawful purpose to discriminate against the union or its adherents. A general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose. It must be established with respect to each discharge. But antiunion bias and demonstrated unlawful hostility are proper and highly significant factors for Board evaluation in determining motive. N. L. R. B. v. WTVJ, Inc., 5 Cir., 1959, 268 F.2d 346; Smith Transfer Co. v. N. L. R. B., 5 Cir., 1953, 204 F.2d 738, 739–740."

See also N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 231 F.2d 567.