NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

THE NEWTON COMPANY, Respondent.

No. 15815.

United States Court of Appeals Fifth Circuit.

Sept. 6, 1956.

Bernard Marcus, Atty., Buffalo, N. Y., Marcel Mallet-Prevost, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, N. L. R. B., Washington, D. C., Theophil C. Kammholz, Gen. Counsel, Fannie M. Boyls, Franklin C. Milliken, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

James L. Spencer, Jackson, Miss., Andrew P. Carter, New Orleans, La., H. V. Watkins, Jackson, Miss., W. Gordon Mc-Kelvey, Nashville, Tenn., Watkins, Edwards & Ludlam, Jackson, Miss., for respondent.

Before RIVES, TUTTLE and JONES, Circuit Judges.

JONES, Circuit Judge.

Before us is a Petition of the National Labor Relations Board filed pursuant to Section 10(e) of the National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq. By the petition the Board seeks enforcement of its order issued on April 27, 1955, against the respondent, The Newton Company, following the usual procedures under Section 10 of the Act. The decision and order of the Board are reported in 112 N.L.R.B. No. 64.

The respondent corporation makes ladies' and men's slacks at Newton, Mississippi, a city of 3500 population, under contract with I. C. Isaacs & Company, Inc., of Baltimore, Maryland. Two other companies located elsewhere in Mississippi bear the same relation to the Isaacs Company as does the Newton Company. The four companies seem to have had a common management. During the summer of 1953 sales of the Newton Company were declining and the inventory of finished goods was increasing. The market price of respondent's products was moving downward. During the last week in July a rumor, apparently unfounded, reached the men engaged in the pressing department of the respondent's plant, that these employees might be replaced by women. Fear of the loss of employment induced much discussion among those of this group and some by other plant employees. One of the pressers was Johnny Dansby. He was talking with "a couple of the boys" in the rest room, so he testified, and they said they needed a union. On Sunday, July 26th, Dansby went to Laurel, Mississippi, and discussed the matter with a Mr. Fairchild, brother-in-law of Dansby, and Vice President of the State Federation of Labor of Mississippi. Through Fairchild a meeting was arranged and held on Wednesday, July 29th, at Decatur, Mississippi, about eight miles from Newton. Conducting or participating in this meeting was W. L. Hines, of Hattiesburg, Mississippi, President of the State Federation of Labor in Mississippi and general organizer in that state for the A. F. of L. About 35 union authorization cards were signed that night. Johnny Dansby was elected temporary chairman for the purpose of getting further cards signed by the employees. The two days following commenced with confusion and proceeded to pandemonium.

During the morning of Thursday, July 30th, groups congregated in the rest rooms and on the sewing floor discussing the union. The foreladies were called to the manager's office and instructed to try to keep the employees at their machines and at work. On several occasions employees were requested to break up their discussions and return to work. Henry Mack, production supervisor of the Isaacs Company in Baltimore, was in Newton to supervise the change over of a production line. S. M. Magee, a building contractor, was engaged in installing air conditioning equipment. The contractor asked Mack to have some finished garments moved so that he could have access to a wall against which they were stack-

ed. On the following morning Mack told the employees of the order department to stop what they were doing and get finished garments ready to be moved. A truck and trailer were at the shipping dock waiting to be loaded with piece goods. Additional employees were taken from the cutting floor to help in this work. The finished garments were packed for shipment to Baltimore, and piece goods were packed for delivery to another of the affiliated companies. All of this was directed by Mack with an air of urgency. The deliveries were being arranged, it seemed, in the normal operations but the haste in getting the goods ready for removal from the plant was prompted by the need to get the space ready for the contractor to work in over the coming week-end. Mack did not explain to the employees the reasons for the packing and shipping. Feltenstein, a supervisory employee who was no longer employed by the company at the time of the Board hearing, said he asked why the goods were being moved and that, to the best of his knowledge, he was told that "there was a rumor that the plant might be picketed and they didn't want to get the piece goods tied up in that plant". Feltenstein could not remember which of three persons, named by him, had made the remark which he recalled to the best of his knowledge. Neither did Mack give any reasons to the plant manager, the cutting room foreman nor, until the movement was under way, to the production manager. Some of the employees, adding two and two together and getting a sum considerably in excess of four, concluded that the packing and moving of goods and materials was in preparation of a plant closing. With the hope that the closing of the plant might be avoided if the union movement was repudiated, three employees, Walters, Ware and Billy Cleveland, decided to go on the sewing room floor and get anti-union signatures. This undertaking was later extended to other departments of the plant. In this enterprise, initiated without any prompting by management, they were joined by Melton Magee, a shipping department foreman, and Lee Turner, in charge of the order department. Jimmy Nelson, head mechanic (there was one other mechanic and two helpers) interrogated other employees regarding their union sympathies. The Board urges that Magee, Turner and Nelson, as "supervisory staff" "interfered with, restrained and coerced" the employees in the exercise of their organizational rights. Neither Magee nor Turner attended supervisors' meetings except when necessary for discussing their own work; they had no right to hire, fire, discipline or promote other employees. Each carried the title of foreman but we do not regard them, as did the Board, as supervisors. On the contrary, each of these men was in the nature of a strawboss, not exercising any independent judgment and not a part of or representing management. Nelson, as chief mechanic, did the same work as his colleague, and was unlike him only in that it was usually to Nelson that directions were given by management. Supervisor is no doubt an elastic term but we cannot stretch it so as to cover Nelson. The activities of persons acting in capacities such as those of Magee, Turner or Nelson are not to be imputed to the company. N. L. R. B. v. Cleveland Trust Co., 6 Cir., 1954, 214 F.2d 95.

The foreladies did not interfere with, and in some instances facilitated the circulation of the petitions, if such they could be called. Some of the foreladies, ignoring management's direction to "stay out of it" actively urged the signing by the girls under them and threatened a closing of the plant. Of the top level management, Henry Mack ordered three of the petition circulators back to work, telling them the circulation was prohibited by company rules. The production manager was credited with telling one of the employees that she had better sign. The papers, when gathered in, were turned over to the plant manager who expressed to those making the delivery his thanks for their interest.

During this hectic Friday two employees, Edith Faye Dansby, the wife of

John Dansby, and Violet Prior, were discharged. The circumstances of these events are hereafter related. Henry Mack, in conversation with one employee, threatened to move the plant unless the employees settled down.

On Saturday, August 1st, the plant being closed, two of the employees called on the plant manager at his home and requested information as to how they might get back the union cards they had signed. The manager said he didn't know but would try to find out. On August 4th the manager gave to the supervisors the addresses of the union and the Labor Board. Some of the supervisors exhibited some zeal in making it known that the addresses were available. A number of requests were made for the return of the cards. None were returned. On August 4th Johnny Dansby quit his job with the Newton Company, stating that all of his buddies were falling out with him and going against him, and to keep from losing any more friends he was quitting and taking another job. August 4th was the last day on which any union cards were turned in.

For some time the excess of production over sales and the increasing of inventory of finished garments were causes of concern to management. Late in August, in anticipation of a reduction of personnel, the company officials asked the foreladies to grade the employees working under them. No prior grading had ever been attempted. Rating sheets were prepared. These had columns for evaluating both the production rating and the job rating, the latter covering attendance, adaptability, attitude and quality. On September 17th the company laid off 33 employees. It used the rating sheets as a basis for the selection of those to be laid off, adhering generally but not rigidly to the gradings in separating those retained from those laid off. General Counsel contended that the layoff was a discharge of employees for union activity in violation of Section 8(a) (3) of the Act. The Trial Examiner found that the layoff was justified by economic conditions and was not per se discrimina-

tory. But, he believed and based findings upon his belief, that the grading system was "a far from reliable or impartial instrument for selecting the less efficient", and hence, because there was a somewhat higher proportion of pro-union employees among those laid off than among the employees in the aggregate, it followed, said the Examiner, that the layoff as to the sixteen pro-union employees was discriminatory and in violation of the Act. Five of these sixteen were offered reemployment and of these five three were rehired.

On September 18th the company announced a general wage increase of 8 to 10 cents an hour effective September 21st. The General Counsel contended that the company was in economic straits, that it was too incredible for belief that a wage increase would follow a layoff, and hence the wage increase was for the purpose of anti-union coercion. The company introduced evidence that competitors had given like wage increases. The company offered a letter dated September 10th from the General Counsel of the Southern Garment Manufacturers Association saying that due to increases in the costs of living wage increases were being made by a number of the members of the organization. The Examiner and the Board adopted the views of the Board's General Counsel.

The Board entered its order directing the company to cease from interference, restraint and coercion of employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C.A. § 157, to offer reinstatement with back pay to Edith Faye Dansby and Violet Prior, to offer to reinstate with back pay eleven of the sixteen laid off employees, and make payment of lost pay to the five who were offered reemployment.

■■ Presented for our determination are questions as to whether substantial evidence supports the Board's findings. We are not called upon to resolve any novel questions of law. In many instances there is a sharp conflict between the testimony of an employee or former employee of the Newton Company and

that of a representative of the company's management as to conversations had. The Trial Examiner has resolved these questions and, for the most part, the Board has followed the Examiner's findings. It is proper that we do likewise in the absence of compelling reason. That the Examiner has for the most part credited the testimony of employees and discredited that of management is not among the grounds that might justify our upsetting findings of fact in such situations. Sardis Luggage Co. v. N. L. R. B., 5 Cir., 1956, 234 F.2d 190; N. L. R. B. v. Dinion Coil Co., 2 Cir., 1952, 201 F.2d 484.

We think that much of the charge against the company as to interference, restraint and coercion was not proved; that many of the things proved were not improper, and that much of the anti-union effort was made by persons who were not a part of management and who acted without its authorization or approval and for whose conduct it should not be held to answer. But, there is adequate proof to meet the "substantial evidence" requirement that the company, acting through those who were unquestionably authorized to speak for it, interfered with, restrained and coerced its employees in the exercise of their organizational rights guaranteed by the Act. See N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, and cases there cited.

We have no difficulty in sustaining the Board's finding that the company discharged Edith Faye Dansby because of her union activities in violation of Section 8(a) (3) of the Act. Mrs. Dansby was the wife of Johnny Dansby, who was the leading spirit in the union organizational effort. She herself was very active on behalf of the union. She had been in the company's employ for three and a half years. For a six months' period and at the time of her discharge was a "utility girl". Employees of this classification possessed such skill and experience as made them available for any job on the production line and, in the absence of a forelady, a utility girl might fill her place. On July 30th and the morning of July 31st she was on a production line under the supervision of Mrs. Hall. She was among those who were told, on the morning of the thirtieth to go back to work. During the lunch period that day she discussed the union with Lucy Saxton, another employee, and both noticed Henry Mack standing a short distance away. During the afternoon Mack inquired of Mrs. Saxton whether she had been given a union card by Mrs. Dansby. Mrs. Hall testified that on two occasions on the 30th she was required to correct Mrs. Dansby's work. Mrs. Dansby said she had never been corrected until the day she was discharged. The job she was doing was one with which she was familiar and one she had worked at for a somewhat extended period before being promoted to utility girl. On the morning of July 31st the forelady, Mrs. Hall, came to Mrs. Dansby's machine and began checking her work in a critical manner, pulling out stitches and giving the work back to be redone. Mrs. Hall stated that if she couldn't do better she would have to take her off the line. Mrs. Dansby replied that she did not know a better way to sew. During some of this time Mrs. Dansby was in tears. About nine thirty in the morning Mrs. Dansby was taken to the office and was discharged. From testimony which was disputed but credited by the Examiner and the Board, it appeared that the work of Mrs. Dansby, rejected by Mrs. Hall, was sent on through the line without repairs.

Mrs. Dansby was undoubtedly a skilled operator, for had she not been such she would not have been promoted to and held the job as a utility girl. The plant manager could recall no other instance of the discharge of a utility girl. There was some discourse of a none-too-civil kind between Mrs. Hall, Mrs. Dansby, and others. The company now urges insubordination to justify Mrs. Dansby's discharge. This contention we can reject. The plant manager testified that Mrs. Hall told him, on the day of the occurrence, that Mrs. Dansby was being discharged because of the poor quality of her work. We can accept this statement

as disposing of insubordination as the ground for the discharge without eliminating union activity as the sole or primary cause. There is ample support in the record for the finding that Edith Faye Dansby was discharged for her union activity.

■ On the same fateful Friday as saw Mrs. Dansby discharged, Violet Prior was also severed from the company payroll. Miss Prior had not attended the union meeting, she had not signed a union card, and she refused to sign the so-called anti-union petition. She had stated to other employees that the shutdown rumor was only to scare the employees and that the unions in England, where she had formerly been employed, benefit the workers. It does not appear that any of the foregoing occurred in the presence of or came to the attention of any of the managing or supervisory personnel of the company. She debated with her forelady, Mrs. Pace, the advantages of union organization. Some time prior to the day of her discharge, a new production line had been set up under the supervision of Mrs. Pace and to this line Miss Prior had been assigned. During this period a number of garments had been ruined by Miss Prior or her machine to the extent they had to be remade. On the day in question a check was made to ascertain whether employees on the new production line were "making production", that is, attaining a minimum quota of work output. Violet Prior testified that she never had made production. Thus it appeared that Miss Prior was a sub-marginal worker. We cannot substitute our choice for that of the Board between equally conflicting inferences of discriminatory or non-discriminatory employer motivation for the discharge of an employee. N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567. The opposition of an employer to union organization and the finding of unlawful interference under Section 8(a) (1) of the Act is not enough of itself to make a discharge a wrongful one. N. L. R. B. v. McGahey, supra. We find no such union activity on the part of Miss Prior that would warrant an inference that she was discharged for any of the prohibited causes within Section 8(a) (3) of the Act. Our appraisal of the whole record leads us to the conclusion that there is no substantial evidence supporting the Board's finding that Violet Prior was discharged in violation of the Act.

In considering whether the union activities of some of the employees were grounds for the inclusion of them in the layoff by the company and of the company's subsequent failure to offer them reemployment, the Board placed little or no credence in the rating of the employees, finding it to be "far from reliable or impartial", done by those having an anti-union bias, and done at a time of consciousness of conflict between the company and the union. The Board reached the conclusion that there was, among the employees laid off, a heavily disproportionate number of union adherents. From this the Board inferred that, absent an adequate explanation by the company, discrimination was established. The Board found there was no adequate explanation. The Board and the company are in disagreement as to the percentage of union partisans among the laid-off employees, and the proper method of making such a computation. The Board computed the percentage on a basis of the total plant employees, while the company urges that it should be based upon the number of employees in the groups affected by the layoff. Perhaps the inference may become stronger as the percentage of union advocates becomes higher. We do not think, however, that our scale is so slightly tipped as to require us to concern ourselves about the percentage figures or the methods by which they were calculated.

■ Evidence is admissible in a proceeding to determine whether or not there has been anti-union discrimination in a lay-off of the percentage of union adherents involved. N. L. R. B. v. Nabors, 5 Cir., 1952, 196 F.2d 272, certiorari denied 344 U.S. 865, 73 S.Ct. 106, 97 L.

Ed. 671. The drawing of such inferences as are to be drawn from percentage testimony is within the province of the Board and if reasonably drawn the inference is evidence, and with other evidence may be substantial evidence such as to entitle the Board's finding based thereon to our acceptance. N. L. R. B. v. Chicago Steel Foundry Co., 7 Cir., 1944, 142 F.2d 306, 153 A.L.R. 838. Has the company furnished an explanation which is adequate to dispell the inference, such as it may be, arising from this percentage testimony?

The rating method used may not have been the most scientific that could have been devised. It was the first effort of its kind in the plant. Perhaps no entirely satisfactory method of evaluating the comparative skills and values of employees has been or can be devised. There is no showing that the plan was set up with the intent that it should be or that it in fact was slanted against those who had been active on behalf of the union. The grading was done by the supervisors, and they were inexperienced in this type of a function. But they were better qualified than any others to whom the task might have been assigned. Some of the supervisors were opposed to the union and had, during the time of the union agitation, said so, but it does not appear that their grading was done with a prejudice favoring anti-union employees and against the pro-union employees, and the inference that this was done seems unwarranted. The time of the employee rating was dictated more by the press of events than by the free choice of management. It was not too far distant in point of time from the efforts at union organization but the fears of the replacement of men pressers with women had abated and rumor of the plant closing had disappeared. No union cards had been turned in for three or four weeks. The union activity had apparently subsided with about the same rapidity as it had flared. Except for the pending charges of the Labor Board against the company the union question seemed to be dormant at the time of the grading. The ratings were a guide to the selection of those laid off although in some instances other considerations were present. It is not established that anti-union discrimination was among these factors. Here again we may say, as has been said before, union membership does not grant immunity against discharge. N. L. R. B. v. Nabors, supra; N. L. R. B. v. McGahey, supra. The freedom of management in selecting from its employees those whose employment is to be terminated is limited only by the prohibition of Section 8(a) (3) of the Act that there shall be no discrimination by reason of union affiliation or activity. N. L. R. B. v. McGahey, supra. The inference that the lay-off and failure to rehire the sixteen persons designated in the Board's order was attributable to their union partiality seems unwarranted. It is not enough to show that the rating method and its use could have been the instruments of discrimination. The discrimination must be shown. Hostility to the union and the percentage testimony do not supply the required proof. One inference cannot be piled upon another. Interlake Iron Corporation v. N. L. R. B., 7 Cir., 1942, 131 F.2d 129. From our review of the record, including consideration of all of the testimony with respect to each of the sixteen persons, we are persuaded that there is not substantial evidence to support this phase of the Board's order.

So too, there were valid reasons other than an effort to discourage union organization, for the pay increase of September 18th. Other plants in the area engaged in like operations were putting wage increases into effect, and it was company policy to pay wages comparable to those of its competitors. At the time of the wage increase to employees of the Newton Company, a like raise was given to the employees of its affiliated companies. We cannot find substantial evidence supporting the Board's finding that the wage increase was motivated by an effort to discourage union participation. See N. L. R. B. v. Cleveland Trust Co., supra.

The provisions of the Board's order, in directing the respondent company to cease and desist from the designated violations of Section 8(a) (1) of the Act, and in directing that Edith Faye Dansby be offered reinstatement with back pay, are entitled to enforcement; and as to the rest of the order, enforcement must be denied.

Enforced in part; and

Enforcement denied in part.