**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DRENNON FOOD PRODUCTS CO., Respondent.**

**No. 17765.**

United States Court of Appeals
Fifth Circuit.

Nov. 24, 1959.

Herman I. Branse, Atty., N.L.R.B., Stuart Rothman, General Counsel, Frederick U. Reel, Attys., National Labor Relations Board, Washington, D. C., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Thomas J. McDermott, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

John Wesley Weekes (of Weekes & Candler), Decatur, Ga., John P. Kanes, Atlanta, Ga., for respondent.

Before HUTCHESON, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

Before us is the petition of the National Labor Relations Board for enforcement of its order issued against respondent Drennon Food Products Co. on February 11, 1959.[1] The Board found that respondent had, in violation of § 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., interfered with, restrained and coerced its employees by interrogating them regarding union activity, threatening economic reprisals in the event of unionization, and promising economic benefits for abandonment of the union. The Board found further that the respondent had violated § 8(a) (3) (1) of the Act by discontinuing operation of its sandwich department and discharging the seven employees working there as reprisal for their union activities.[2]

Accepting in all material respects the findings of the Trial Examiner, the Board entered its order requiring respondent to cease and desist from discouraging membership in or activities on behalf of the union, from discharging or discriminating against employees by reason of their union activities, and directing respondent affirmatively "to offer the seven employees of the sandwich department immediate and full reinstatement of their former or substantially equivalent positions, to make them whole for any loss of pay and to post the customary appropriate notices." [3]

■ Without going into the evidence in detail, it is sufficient to say that, while the case is not a strong one, we think there was substantial evidence from which the Board could find that respondent had, in dealing with certain of its employees, exceeded permissible limits of argument and persuasion, and that the order to cease and desist from such activities ought to be enforced.

The main battleground, however, concerns the closing of respondent's sandwich department and the termination of the services of the seven employees working therein. The Trial Examiner and the Board found in effect that the whole transaction in which the sandwich machinery was transferred to the Bullock Paper Company and a contract made with that company to supply respondent with sandwiches was a sham and pretense, and that the testimony by which respondent sought to prove the transaction was false *in toto*. A brief summary of the dealing of respondent with its employees in connection with the union and its organization is necessary, in that it furnishes the main factual background upon which the Examiner and the Board rested their decisions.

Certain of respondent's employees, including those in the sandwich department, initiated union activity about March 9, 1957 by signing union authorization cards with Local 60 Bakery and

1. 122 N.L.R.B. No. 163.

2. The complaint filed by the General Counsel charged also that respondent had refused to bargain collectively with the union, but the Trial Examiner found that this charge was not supported and dismissed the complaint as to it, and the Board affirmed the rulings of the Trial Examiner in that respect.

3. The quotation is from the Board's brief, but the Board, in its finding, stated that "it will effectuate the policies of the Act to direct the respondent to resume operations of the sandwich department under the conditions prevailing before the discrimination occurred," subject to the qualification that respondent need not reopen the sandwich department if it would reinstate, in substantially equivalent positions, the seven employees theretofore employed in the sandwich department.

Confectionery Workers' International Union of America, AFL-CIO [4] as their bargaining agent. An election was set for May 9th and it resulted in a victory for the union, which was certified as bargaining agent on May 17th. The interrogation of the employees and the other acts with respect to which we find the Board's order supported by substantial evidence, occurred between those dates and there was also evidence of surveillance of union meetings by agents of respondent thereafter. Representatives of respondent and of the union met on June 12th and July 11th.

July 15, 1957, respondent delivered a letter to each of its seven employees advising that the sandwich department was discontinued.[5] The union promptly contacted respondent's negotiator and attorney seeking to bring about re-employment of these employees and to conduct further bargaining concerning the terms of a contract. This was followed by a letter of the union representative renewing these demands, which was answered by Attorney Weekes as follows:

"Receipt is acknowledged of your letter of July 19th with further reference to the closing of the sandwich department of the above company.

"Mr. Drennon nor the Company has any interest in the Company which will now make the sandwiches and sell them to Drennon Food Products Company. As a matter of good business, it was decided by the Company to discontinue the operations of this Department and to buy the products outright from another company. Drennon Food Products Company has no authority whatever

over the employees of this other company and would not be in position to bargain for them." [6]

The only testimony concerning the reasons for closing the sandwich department and arranging with the Bullock corporation to supply respondent's needs was given by Jake C. Drennon, president and majority stockholder of respondent, which was supplemented by the writings executed between respondent and Bullock placed in evidence by the General Counsel. Drennon testified that the sandwich department was closed exclusively for economical reasons, and that a contract had been made with Bullock Paper Company, with which he had no connection whatsoever, to furnish respondent's requirements of sandwiches. He stated further that the sole reason for making the arrangement with Bullock was that sandwiches could thereby be obtained for about two cents per dozen less than respondent had been able to make them. He further stated that the matter of making such a deal had first been mentioned between Bullock and himself about a year before the deal was consummated and that negotiations had been conducted sporadically in the interim, which resulted in the arrangement which embraced the following features.

Respondent contracted orally with Bullock to make sandwiches for respondent, reserving the trade names under which it had been accustomed to dispose of its sandwiches, but granting to Bullock the right to sell to any others it might choose. The written agreements covering phases of the transaction were placed in evidence by the General Counsel. One was a lease dated July 1, 1957 by which K & J Corporation, whose stock

---

4. This union, after filing the charges upon which the complaint was based, was expelled from AFL-CIO; but it maintained its autonomy and these proceedings were carried to their conclusion on behalf of the union as an independent organization.

5. "The Company is no longer in the manufacture of sandwiches, and therefore that department is discontinued. You are given, herewith, one week's advance pay, and you will not report to work further.

Also we enclose one week's pay for vacation, which you have earned."

6. The letter continued with further statements about wages and working conditions of the remaining employees and further negotiations were had, all of which led to the finding by the Examiner that the proof failed to support the charge of failure of respondent to participate in adequate bargaining negotiations.

was owned by Drennon and his wife, leased to Bullock for one year at $400.00 per month certain machinery used in making sandwiches, subject to cancellation by either party upon ninety days' notice. The machinery was not to be removed from the building, which was close by respondent's place of business, without written consent of respondent.

A separate agreement between K & J and Bullock covered a portion of this building at $200.00 per month and likewise was for the period of one year. A third written agreement between respondent and Bullock covered the purchase by Bullock of certain of respondent's raw materials and the restriction of the use by Bullock of the trade marks or trade names of respondent.

After President Drennon had been examined by respondent's attorney and cross-examined by the attorney for the General Counsel, the Trial Examiner conducted a further examination occupying ten pages of the record, a good portion of which was seeking to ascertain how President Drennon knew that the sandwich department was losing money.

Drennon testified that one of his office men named Ewing had analyzed the records and advised the president that the sandwich department was "costing you too much money," which "finally ended up with farming the work out to the Bullock Paper Company." [7] The Trial Examiner did not ask to see the records or to have Ewing brought in, but seemed content to accept the statements of Drennon that the examination of the records by Ewing and himself had convinced him that he could not operate at a profit and had better consummate the agreement with Bullock which had been under discussion.

In his findings, the Examiner remarked that "Drennon testified further that he determined from respondent's records that it was cheaper to buy than to make sandwiches. However, no such records were made a part of this proceeding." For this reason and those quoted in the margin from the Examiner's report,[8] the Trial Examiner rejected "the testimony of Jake Drennon that business reasons motivated the closing of the sandwich department."

7. A portion of the examination by the Trial Examiner follows:

"Trial Examiner: Do you have certain records from which you determined that it was cheaper to farm this stuff out than to do it yourself?

"The Witness: That is right. We got them.

"Trial Examiner: In other words, you determined that from company records, is that how you determined it?

"The Witness: That is right. Mr. Ewing got it out.

"Trial Examiner: In other words, you conferred with Mr. Ewing and maybe someone else, I do not know, and looked at the records and from the records determined it was costing you too much, is that what happened?

"The Witness: Yes. Mr. Ewing was the one that handles all that.

"Trial Examiner: Pay attention to me for a moment. As I understand your testimony you conferred with Mr. Ewing to find out whether or not this sandwich department was costing you too much money:

"The Witness: That is right.

"Trial Examiner: And between the two of you and the Company records, you determined that it was costing you too much money and you had better do something about it?

"The Witness: That is right.

"Trial Examiner: Then as a result of that, you finally ended up with farming the work out to the Bullock Paper Company?

"The Witness: That is right."

8. "As previously noted in this Report, Bullock Paper Company, Inc., acquired the machinery which it uses to manufacture sandwiches from Respondent and K & J Corporation and this machinery was moved from Respondent's place of business on or about July 13 and 14. Drennon testified at length as to how long it was costing too much to operate and how long the closing of the sandwich shop was in contemplation but his testimony on these matters is far from clear, in places self-contradictory, [Note: For example, he first testified that it was contemplated for about a year, and later that he did not know about the costs until he went over Respondent's records the last part of June 1957.] and inconsistent with other undisputed facts in the record —i. e., the wage increases made effective on or about April 5, 1957, and the fact that no one ever consulted with the

We do not think that either the Trial Examiner or the Board had the power to reject undisputed testimony because of suspicion, and a reading of the record shows that Drennon's testimony was not in fact self-contradictory or lacking in clarity, or that the other reasons given by the Examiner and adopted by the Board were based upon substantial evidence. The failure of Drennon to produce the records was patently brought about in large part by the action of the Trial Examiner in taking over the cross-examination concerning the records. There is no showing that the records were not available for examination by the Trial Examiner if he had called for them, or that Mr. Ewing was not accessible for use as a witness. The conclusion of the Board that the evidence would be presumed to be unfavorable to respondent is not justifiable under the facts of this record.

If it be thought that Drennon's statement about the records was not the best evidence, it was elicited by the Trial Examiner and no objection was made by the General Counsel that testimony manifestly sufficient to establish the facts the Trial Examiner was inquiring into was not properly admissible under the best evidence rule. No duty rested upon Drennon to bring in records when he had, at the instance of the Trial Examiner, given full testimony about what the records showed.

In one of the early cases before this Court, Judge Sibley wrote an opinion which has been followed and cited many times and which contains language applicable here: [9]

"In each case such membership may have been the cause, for the union was not welcomed by the persons having authority to discharge and employ. If no other reason is apparent, union membership may logically be inferred. Even though the discharger disavows it under oath, if he can assign no other credible motive or cause, he need not be believed. But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point. * * * That the witness was or is an employee of the party in whose behalf he testified, is not in itself a reason to discard his oath, appears from the cited case, and was extensively demonstrated in Chesapeake & Ohio R. Co. v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983. * * *"

The "discharger" here swore positively that there was no discharge but a discontinuance of a portion of respondent's business activities which were costing too much money and when the sandwiches could better be supplied from an independent source and at less cost. His testimony is not disputed in any way. The lawyer conducting the negotiations solemnly made the same statement in a letter to the union representative. This testimony and these actions are not discredited by any evidence or circumstances of such character as could give rise to anything more than a suspicion.

The General Counsel had access to proof which would have contradicted that which is in the record if it was false,[10] but he chose not to do so.

---

floorlady in charge of the sandwich department (Smallwood) as to whether or not this department could be run more efficiently * * *."

9. National Labor Relations Board v. Tex-O-Kan Flour Mills Co., 5 Cir., 1941, 122 F.2d 433, 438, 439.

10. He could have subpoenaed Ewing with respondent's records; could have called Bullock and his employees into court with their records; and could have shown all of the details of the course of business with Bullock from the time he took over until the time of the hearing.

A recent decision of this Court [11] involved facts quite close to those before us. The language there used is appropriate to the situation with which we are faced:

"* * * If an ordinary act of business management can be set aside by the Board as being improperly motivated, then indeed our system of free enterprise, the only system under which either labor or management would have any rights, is on the way out, unless the Board's action is scrupulously restricted to cases where its findings are supported by substantial evidence, that is evidence possessed of genuine substance. * * *"

We do not have here a close question of fact in connection with which the Board would have the right to make "The initial choice between two equally conflicting inferences of discriminatory or non-discriminatory employer motivation for an employee discharge * * *," which we discussed in the Houston Chronicle case supra and amplified and modified in N. L. R. B. v. Coats & Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 568, 572, and cf. N. L. R. B. v. Fox Manufacturing Co., 5 Cir., 1956, 238 F.2d 211.

▮ While motives were entitled to consideration, the ultimate question before the Examiner and the Board in this case was whether the sandwich department was in fact discontinued and the making of sandwiches turned over to a third party not acting for or controlled by respondent. As to this question the record contains no dispute at all. The burden rested upon the General Counsel to establish by acceptable substantial evidence on the whole record that there was a discharge for that it was based upon the forbidden motives defined in the statute.[12] The writings placed in evidence by the General Counsel on their face constitute an independent arrangement with Bullock, and all of the other evidence, including Drennon's testimony and the letter written by respondent's attorney-negotiator, shows that the entire transaction was bona fide.

▮ The Board is not at liberty to reject such evidence and base it findings upon suspicion and conjecture. This is particularly true where charges of fraud are involved. We hold that this portion of the Board's findings was not based upon substantial evidence. The cease and desist order of the Board is enforced as to subparagraphs (b) and (c) of Paragraph No. 1.[13]

The affirmative action ordered by Paragraph No. 2 is enforced as to subparagraphs (d) and (e) [14] after modify-

---

11. National Labor Relations Board v. Houston Chronicle Publishing Co., 5 Cir., 1954, 211 F.2d 848, 855.

12. N.L.R.B. v. McGahey, 5 Cir., 1956, 233 F.2d 406; N.L.R.B. v. Ferguson, 5 Cir., 1958, 257 F.2d 88, and cf. N.L.R.B. v. New Madrid Manufacturing Co., 8 Cir., 1954, 215 F.2d 908.

13. "1. Cease and desist from:

\* \* \* \* \*

"(b) Interrogating its employees as to the manner in which they voted and their membership in, or activities on behalf of, any labor organization, in a manner constituting interference, restraint, or coercion in violation of Section 8(a) (1) of the Act; threatening to discharge its employees, or to sell its plant or to take any other economic reprisals against them because they voted for or supported a union; and promising more money and better jobs if the employees abandoned the union:

"(c) In any other manner, interfering with, restraining, or coercing their employees in the exercise of the right to self-organization, to form, join, or assist any labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a) (3) of the Act."

14. "2. Take the following affirmative action which the Board finds will effectuate the policies of the Act.

\* \* \* \*

"(d) Post at its plant in Atlanta, Georgia, copies of the notice attached hereto and marked 'Appendix.' Copies of

ing the notice to employees so as to eliminate the items thereof not included in the paragraphs which are hereby enforced. Enforcement of all other portions of the Board's order is

Denied.

said notice, to be furnished by the Regional Director for the Tenth Region, shall, after being duly signed by the Respondent's representative, be posted by the Respondent immediately upon receipt thereof, and be maintained by it for sixty (60) consecutive days thereafter in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondents to insure that said notices are not altered, defaced, or covered by any other material;

"(e) Notify the Regional Director for the Tenth Region, in writing, within ten (10) days from the date of this Order as to what steps the Respondent has taken to comply herewith."